IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LYNNE A. REGAN                          :
                                        :          CIVIL ACTION
            v.                          :
                                        :          NO. 06-1686
UPPER DARBY TOWNSHIP, ET AL.            :

SURRICK, J.                                    MARCH __11__, 2009

<u>**MEMORANDUM & ORDER**</u>

Presently before the Court are the Motions for Summary Judgment of Defendants

Thomas A. Johnson and Michael Kehrle (Doc. No. 77) and Defendant James Johnson (Doc. No.

78).  For the following reasons, the Motions will be granted.

## I.      FACTUAL BACKGROUND[1]

Lynne A. Regan ("Plaintiff") brought this civil rights action after she was arrested several

times for violating a Protection from Abuse Order that prohibited her from having any contact

with her ex-boyfriend, a firefighter named Donald Kuhfuss ("Kuhfuss").  A detailed review of

the facts is necessary to fully understand how this relationship found its way into the criminal

and civil courts.

### A.      The Circumstances Surrounding Plaintiff and Kuhfuss's Relationship

In December 2002, Plaintiff began a relationship with Kuhfuss when he was a firefighter

with the Upper Darby Fire Department.  (*See* Pl.'s Dep. 310; Pl.'s Am. Omnibus Resp., Doc. No.

---

[1] In reciting the factual background, we view all facts and inferences in the light most
favorable to Plaintiff, the nonmoving party.  *See Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir.
2007) (*citing Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000)) (noting that
when deciding a motion for summary judgment, the court "must view the facts in the light most
favorable to the nonmoving party and draw all inferences in that party's favor").

94 at 3.)  In July 2003, Plaintiff and Kuhfuss moved in together and resided in a house owned by

Kuhfuss in Delaware County, Pennsylvania.  (Pl.'s Dep. 54, 76, 311.)  Plaintiff and Kuhfuss

became engaged to be married in the Spring of 2004.  (*See* Pl.'s Omnibus Resp., Doc. No. 94 at

3; Pl.'s Dep. 56-57.)  The engagement, however, would not last.  Within months, the couple

began to experience serious "problems" in their relationship.  (Pl.'s Dep. 57.)  In late October

2004, Plaintiff discovered that Kuhfuss was having an affair with a woman by the name of Lauri

Millet ("Millet").  (Pl.'s Dep. 53.)  The relationship between Plaintiff and Kuhfuss became

unsteady and changed "on a daily basis."  (*Id.* at 56.)  On some days Plaintiff and Kuhfuss

"[would] be getting along fine . . . as if nothing else occurred, [but] then . . . it would all blow

up."  (*Id.*)  "It was back and forth, back and forth."  (*Id.*)  Their wedding was off.  (*Id.* at 109.)

 In late October 2004, Plaintiff told Kuhfuss that she was moving out.  (*Id.* at 62.)

Plaintiff did not tell Kuhfuss precisely when she was moving and on November 6, 2004, when

Kuhfuss was not home, she began to remove her belongings.  (*Id.* at 63, 66, 205.)  Plaintiff

removed a variety of items from the house including a couch that she and Kuhfuss had purchased

jointly.  (*Id.* at 88.)  That evening, Kuhfuss arrived home and realized what Plaintiff had done.

(*Id.* at 66-68, 88.)  Plaintiff returned to the house at Kuhfuss's request and was greeted by police

officers that Kuhfuss had called to the scene.  (*Id.* at 67-68.)  A police officer asked Plaintiff to

turn over her keys, which were given back to Kuhfuss.  (*Id.* at 71.)  Plaintiff agreed not to return

to the house again that night even though she had not finished removing all of her belongings.

(*Id.* at 71, 79.)

 Later that night, Kuhfuss called Plaintiff again and told her that he "was going to kill

himself."  (*Id.* at 72.)  Plaintiff called 911 and reported what Kuhfuss had said, but Plaintiff had

no further contact with authorities.  (*Id.* at 73.)  A few days later on November 8, 2004, Plaintiff

went to the Delaware County Courthouse and filed a petition for a Protection from Abuse order

("PFA") against Kuhfuss.  (*Id.* at 74.)  In her petition, Plaintiff wrote that when she was at

Kuhfuss's house on November 6, Kuhfuss had "c[o]me out chasing [her]" and "broke the

[bedroom] door down."  (*Id.* at 77; Pl.'s PFA Pet., Nov. 8, 2004, Doc. No. 79, Ex. I.)  Plaintiff

wrote that Kuhfuss was "erratic in behavior" and "increasingly violent."  (Pl.'s Dep. 77.)

Plaintiff listed Kuhfuss's address as her residence on the PFA petition even though she was no

longer living there.  (*Id.* at 77, 82.)  The words "evict" and "exclude" were circled in the petition

near Kuhfuss's address indicating the relief that Plaintiff was requesting.  (*Id.*)  Plaintiff denies

that she circled these words and denies that she was trying to evict Kuhfuss from his own home.

(*Id.*)  However, Plaintiff admits that "when [she] signed [the petition] and saw that 'evicted' and

'excluded' w[ere] circled," she did not bring this to anyone's attention.  (*Id.* at 80.)  Plaintiff did

not "feel [that] it was important" to tell the court that Kuhfuss owned the house and that she had

moved out.  (*Id.* at 83-84.)  The court entered a PFA order evicting Kuhfuss from his own home.

(*Id.* at 85; *see also* Pl.'s PFA Pet., Nov. 8, 2004, Doc. No. 79, Ex. I.)  The PFA order was later

amended to remove the eviction provision.  (*See id.*)  The PFA also ordered Kuhfuss not to

contact Plaintiff and granted "Plaintiff an opportunity to remove her and her children's personal

belongings from the premises under police supervision" at a later, unspecified time.  (*See* Pl.'s

PFA Pet., Nov. 8, 2004, Doc. No. 79, Ex. I.)

     At the same time, Kuhfuss petitioned the court and received a reciprocal PFA order

against Plaintiff.[2]  (Pl.'s Am. Omnibus Resp., Doc. No. 94 at 3.)  Kuhfuss's PFA order against

Plaintiff arose out of the same November 6, 2004 incident.  (*See* Kuhfuss's PFA Pet., Nov. 8,

2004, Doc. No. 79, Ex. J.)  The PFA order provided that Plaintiff not contact Kuhfuss and Jane

Minster ("Minster"), Kuhfuss's 74-year-old mother.  (*Id.*; *see also* Pl.'s Dep. 288.)  The PFA

order provided that "[Plaintiff] is prohibited from having ANY CONTACT with [Kuhfuss and

Minster] at any location."  (*See* Kuhfuss's PFA Pet., Nov. 8, 2004, Doc. No. 79, Ex. J.)  The

PFA order also evicted Plaintiff from the Kuhfuss residence, providing that Plaintiff "shall have

no right . . . to enter or be present on the premises."  (*Id.*)

On November 9, 2004, the day after Plaintiff and Kuhfuss petitioned for reciprocal PFA

orders, a local television station aired a special news report about the ease with which a person

can be involuntarily committed to a hospital for an emergency psychiatric evaluation.  (*See*

WPVI Tr., Nov. 9, 2004, Doc. No. 80, Ex. I.)  The subject of the news story was a woman who

had her ex-boyfriend involuntarily committed to a hospital after she falsely alleged that he was

suicidal.  (*See id.*; *see also* Doc. No. 78-2 at 3 n.2.)  Plaintiff indicates that she did not see this

news story.[3]  (Pl.'s Dep. 108.)  On November 10, 2004, the day after the story aired on

---

[2] While Kuhfuss was away from home obtaining the PFA against Plaintiff, Fire Marshall
Dan Lanni saw Plaintiff in the Kuhfuss driveway "loading items into her car."  (Lanni Aff., Nov.
21, 2008, ¶ 1.)  Lanni also "observed that the screen door at [Kuhfuss's house] was demolished
and, also, that [Kuhfuss's] door window was shattered."  (*See id.* ¶¶ 2-3; *see also* Photographs of
Damage, Doc. No. 80, Ex. G, identified at Lanni Aff. ¶ 3.)

[3] Plaintiff testified that she learned about the possibility of filing the petition from a
"domestic abuse place" in Media, Pennsylvania.  (Pl.'s Dep. 221.)  Plaintiff did not recall where
the "domestic abuse place" was located or what time she went there, except she believed that it
was "in the evening" at "maybe dinnertime."  (*Id.*)  Plaintiff did not remember if she signed a
log-in sheet when she arrived and did not remember the names of anyone with whom she spoke.
(*Id.* at 221-22.)

television, Plaintiff filed a petition to have Kuhfuss involuntarily committed to Fitzgerald Mercy

Hospital on grounds that Kuhfuss was "a clear and present danger to others" and presented "a

reasonable probability of suicide."  (Pl.'s Dep. 89-92, 220; *see also* Involuntary Commitment

Pet., Doc. No. 79, Ex. T.)  In the petition, Plaintiff wrote that "[Kuhfuss] has been acting

irrational and has shown erratic behavior."  (*Id.*)  Plaintiff also wrote that Kuhfuss was

"confused" and he "does not know why he is acting the way he is."  (*Id.*)  On the same day,

November 10, 2004, Kuhfuss filed a civil complaint against Plaintiff with the Delaware County

District Justice in connection with Plaintiff's removal of the items from his home.  (*See* Civil

Compl., Doc. No. 79, Ex. U; *see also* Pl.'s Dep. 97-99.)  It is unclear which was filed first,

Kuhfuss's civil complaint or Plaintiff's petition to have Kuhfuss involuntarily committed to the

hospital.

### B.      Kuhfuss Suffers from a Massive Stroke

On the evening of November 10, 2004, while Kuhfuss was at the Fitzgerald Mercy

Hospital being interviewed by doctors as a result of Plaintiff's involuntary commitment petition,

he suffered a debilitating stroke that left him partially paralyzed and unable to speak.  (*See* Pl.'s

Dep. 108, 240-241, 291; Am. Compl. ¶ 27; Deputy Chief Johnson Dep. 14, 30; Letter from

Deputy Chief Johnson to Detective Johnson, Dec. 3, 2004, identified at Deputy Chief Johnson

Dep. 30.)  As a result of the stroke, Kuhfuss was admitted to the hospital.  (Deputy Chief

Johnson Dep. 14.)  Plaintiff was notified of the stroke the next morning.  (Pl.'s Dep. 134, 251.)

### C.      Millet Files a Police Report about Plaintiff

On November 12, 2004, Lauri Millet, Kuhfuss's paramour, contacted Detective Johnson

at the Upper Darby Police Department and reported receiving "threatening and harassing phone

5

calls from a female she [knew] as [Plaintiff]." (Millet Dep. 38-40; Crim. Compl., Jan. 12, 2005,

Doc. No. 79, Ex. M.) Millet reported that Plaintiff had threatened to "kill her" during one of the

calls.[4] (Crim. Compl., Jan. 12, 2005, Doc. No. 79, Ex. M.) Millet further reported that the calls

started in September 2004 "but did not become threatening until October." (*Id.*) Detective

Johnson reviewed Millet's cell phone account statements and found "numerous brief or hang-up

calls from blocked phone numbers." (*Id.*) Millet reported her belief that at least 28 of those calls

were from Plaintiff. (*Id.*) Detective Johnson sought a search warrant to obtain Plaintiff's cell

phone records from Cingular Wireless. (*Id.*) The court issued the search warrant that Detective

Johnson then transmitted to Cingular Wireless. (*See* Search Warrant and Cell Phone Records,

Doc. No. 79, Ex. P.)

### C. Police Order Plaintiff to Leave the Kuhfuss Premises and Plaintiff Refuses

On November 13, 2004, Plaintiff called the police to make arrangements to pick up her

personal belongings from Kuhfuss's house. (Pl.'s Dep. 126.) Plaintiff's PFA order permitted

her to retrieve these items under police supervision. (*See* Pl.'s PFA Pet., Nov. 8, 2004, Doc. No.

79, Ex. I.) Sergeant Michael Kehrle ("Kehrle") met Plaintiff in the driveway of the Kuhfuss

residence for this purpose. (Pl.'s Dep. 126-27.) Plaintiff gave her paperwork to Kehrle, who

then entered the Kuhfuss residence while Plaintiff waited inside her car with her teenage

daughter. (*Id.* at 126-28, 278.) Minster, Kuhfuss's mother and a protected person under

Kuhfuss's PFA order against Plaintiff, was inside the house when Kehrle arrived. (*Id.* at 133-

34.) Minster was "upset" that Plaintiff was there and telephoned Ed Cubler, Chief of the Upper

---

[4] Although Plaintiff denies engaging in the conduct of which Millet complained, Plaintiff
admits that Millet made the report and is not aware "of any facts that would show that
[Detective] Johnson knew that [Millet's] written statement was untrue." (Pl.'s Dep. 253.)

Darby Township Fire Department and Kuhfuss's boss, to ask him to come to the house.  (Deputy Chief Johnson Dep. 18, 33, 36-37; Cubler Dep. 16-17.)  Cubler then called the Deputy Chief of the Fire Department, James Johnson, and asked him to come to Kuhfuss's house.  (Deputy Chief Johnson Dep. 18.)  Plaintiff and her daughter, while waiting inside their car in the driveway, observed Cubler, Deputy Chief Johnson, Detective Thomas A. Johnson[5] and unknown firefighters arrive on the scene and enter the Kuhfuss home.  (Pl.'s Dep. 130-32.)  Deputy Chief Johnson parked his car in the driveway behind Plaintiff's car.  (*Id.* at 141.)  As Deputy Chief Johnson walked past Plaintiff's car to enter the house, he yelled, "I hope you go to hell, you fucking bitch."  (*Id.* at 133, 232-33.)

"More than twenty minutes" after Kehrle first entered the Kuhfuss house, Kehrle came out and told Plaintiff that Minster "didn't want [Plaintiff] in the house."  (*Id.* at 133-34, "[Kehrle] told me that he wanted me to leave and that he wasn't going to allow me into the house because [Kuhfuss's] mother didn't want me in the house.").  Rather than leaving the premises as Kehrle directed, Plaintiff remained inside of her locked car.  (*Id.* at 135-36.)  Plaintiff's "doors were locked" and her "windows were up."  (*Id.* at 137.)  Plaintiff testified that she "wouldn't say [that she] was hysterical," but she was "definitely crying" and "really scared" inside of her locked car.  (*Id.* at 136, 140.)  Plaintiff's daughter, who was also inside of the car, tried "to calm [Plaintiff] down."  (*Id.* at 141.)  Plaintiff called 911 "two or three times" and demanded to speak with "somebody of rank."  (*Id.* at 135, 238.)  Meanwhile, Kehrle began "banging on [Plaintiff's car] window" with his hand and "telling [Plaintiff] that he wanted [her] to open the door."  (*Id.* at

---

[5] Detective Johnson and Deputy Chief Johnson are brothers.  (Deputy Chief Johnson Dep. 8-10.)

138.)  Kehrle thought that Plaintiff "was having a panic attack."  (Kehrle Dep. 17-18.)  She was

"breathing erratically."  (*Id.*)  Kehrle told Plaintiff "that [she] had a choice: . . . [Plaintiff] could

either be arrested or [she] could go to the hospital."  (Pl.'s Dep. 139.)  Kehrle explained

Plaintiff's choice as follows:

> Well, by her refusing to leave, she was in violation of the PFA order that was filed
> against her; so, she had a choice of either getting arrested or if she would leave and
> go with the paramedics, that would be fine, but she was not in a condition to drive the
> vehicle away on her own.  That was pretty apparent.

(Kehrle Dep. 18.)  Eventually Plaintiff opened her door, Kehrle "grabbed [her] keys," and

Plaintiff was taken by ambulance to the hospital.  (Pl.'s Dep. 142-43.)  Once there, Plaintiff

spoke with a nurse and was released from the hospital after a "half hour, [or] 45 minutes."  (*Id.* at

146.)

### D.      Minster Complains to Police about Plaintiff

On November 14, 2004, Minster complained to police that Plaintiff had visited the

Kuhfuss residence, unannounced, a few days earlier.  Minster provided the following statement

to police:

> [Plaintiff] came to the kitchen door a little after 6:30 p.m. [on November 11, 2004,]
> and rang the bell.  She told me that she knew she wasn't supposed to be there but
> wanted to let me know that she was trying to help [Kuhfuss]. She also wanted to tell
> me that she loved [Kuhfuss].

(Minster Statement, Nov. 14, 2004, Doc. No. 79, Ex. S.)  Minster's statement also indicated that

Plaintiff did not try to get inside the house, but that Plaintiff "held the storm door open so [that

Minster] couldn't close it."  (*Id.*)  At her deposition, Plaintiff denied visiting the Kuhfuss

residence and contended that Minster's statement to police was "untruthful."  (Pl.'s Dep. 167.)

### E.      Plaintiff Contacts Kuhfuss in the Hospital

On or about November 15, 2004, the day after Minster's report to police and several days after the incident in Kuhfuss's driveway, Plaintiff received a telephone call from an unidentified male who told her that "[Kuhfuss] wanted to see [her] because he was dying."  (Pl.'s Dep. 108-09, 241-42.)  Plaintiff therefore went to Fitzgerald Mercy Hospital to visit Kuhfuss even though Plaintiff knew that the PFA prohibited her from having contact with him.  (*Id.* at 110, 151-52.)  After being in Kuhfuss's room for two hours, Officer Ryan Wisely and another police officer arrived and asked Plaintiff what she was doing.[6]  (*Id.* at 153, 291.)  The officers asked Plaintiff to leave.  (*Id.* at 151-55.)  Plaintiff complied and the officers escorted her out of the hospital.  (*Id.* at 294.)  Once outside of the hospital, Plaintiff was asked to come to the police station since "detectives from Upper Darby wanted to speak with [her]."  (*Id.* at 153, 156.)  The detectives did not show up, however, so Plaintiff had no contact with them.  (*Id.* at 156.)  After spending two hours waiting in a cell, Plaintiff was released and taken back to her car.  (*Id.* at 157, 299.)  Thereafter, Wisely filed a criminal complaint against Plaintiff charging her with violating the PFA order.  (*See* Crim. Compl., Nov. 15, 2004, Doc. No. 90, Ex. G.)

### F.    Police Arrest Plaintiff based on Minster's Report

On November 18, 2004, Detective Johnson filed a criminal complaint against Plaintiff in response to the report made by Minster.  That day, Plaintiff was at her mother's house "watching church on TV" when Detective Johnson and other officers arrived early in the morning to arrest Plaintiff.  (Pl.'s Dep. 159.)  The officers told Plaintiff that she was under arrest for going to the Kuhfuss house "two weeks ago or something."  (*Id.*)  The officers did not enter the house and

---

[6] Officer Wisely was originally named as a defendant in the Amended Complaint. Plaintiff's claims against Wisely were dismissed with prejudice by stipulation of the parties on November 7, 2007.  (*See* Doc. No. 52.)

instead waited outside while Plaintiff got dressed.  (*Id.* at 160-61.)  Plaintiff was then taken into

custody and transported to the police station.  (*Id.* at 161-62.)  Plaintiff posted bail and was

released.  (*Id.* at 326.)

### G.       Complaints that Plaintiff is Contacting Kuhfuss

On December 19, 2004, the individuals who were caring for Kuhfuss reported to

Detective Johnson that Plaintiff had again tried to contact Kuhfuss.  (*See* Crim. Compl., Dec. 22,

2004, Doc. No. 79, Ex. O.)  They reported that on December 17, 2004, at 4:03 p.m., Plaintiff sent

a text message to Kuhfuss's cell phone.  (*Id.*)  Plaintiff does not deny doing this.  (Pl.'s Dep. 244,

"Q: Did you ever send [Kuhfuss] a text message on December 17, 2004?  A:  I could have.").

They also reported receiving hang-up phone calls from various pay phones located between

Plaintiff's home and Kuhfuss's home.  (*See* Crim. Compl., Dec. 22, 2004, Doc. No. 79, Ex. O.)

The hang-up calls allegedly continued for the next two days.  (*Id.*)  The caregivers further

reported that "[i]ntermixed in these calls was a call from [Plaintiff's] known cell phone number."

(*Id.*)  Moreover, they reported seeing Plaintiff in a vehicle in front of the Kuhfuss residence.[7]

(*Id.*)

On December 21, 2004, the caregivers again reported to Detective Johnson that Plaintiff

had tried to call Kuhfuss, this time from her place of employment.  (*Id.*)  They reported that

when Plaintiff called, the call was placed on speaker phone and they could hear Plaintiff

speaking.  (*Id.*)  At her deposition, Plaintiff admitted to making this call:

Q:       [The criminal complaint states] that you contacted the protected residents

---

[7] Detective Johnson later checked the license number and contacted the owner of the
suspect vehicle and determined that it was not Plaintiff in the vehicle.  (Supp. Offense Report,
Dec. 22, 2004, Doc. No. 79, Ex. G.)

> from your place of employment at 5:24 p.m. and spoke to Donald Kuhfuss.
> Did you do that on that particular day?
> A:   Yes, I called him back.
> . . .
> Q:   Were you, in fact, talking to [Kuhfuss] on December 21st?
> A:   Yes, I called him back.  He had called me at work and I called him back.

(Pl.'s Dep. 170.)  Plaintiff admitted that she called Kuhfuss at various other times, including at

3:39 in the morning:

> Q:   Did you call the [Kuhfuss] residence at 3:39 in the morning?
> A:   If he called me, I called him back.

(Pl. Dep. 172.)  Plaintiff admitted to calling Kuhfuss "as many as 50 times" per week during the

month of December 2004.  (*Id.* at 252.)  In addition, it was reported to Detective Johnson that on

December 20, 2004, Plaintiff visited the Kuhfuss home and "attempted to get [Kuhfuss] to sign

an affidavit requesting the withdrawal of the protection order and declare that the couple had

reconciled."[8]  (*See* Crim. Compl., Dec. 22, 2004, Doc. No. 79, Ex. O.)

Detective Johnson followed up on these reports.  (*Id.*)  He determined that the affidavit

delivered to the Kuhfuss residence appeared to be in Plaintiff's handwriting.  (*Id.*)  He also

determined that the numbers for Plaintiff's cell phone and work phone appeared on the Caller ID

at the Kuhfuss residence.  (*Id.*)  Finally, he reviewed emails and text messages and determined

that they were sent to Kuhfuss from Plaintiff's home and place of employment.  (*Id.*; *see also*

Detective Johnson Dep. 215-17.)  Based on all of this information, on December 22, 2004,

Detective Johnson filed a criminal complaint against Plaintiff charging her with another violation

of the PFA.  (*See* Crim. Compl., Dec. 22, 2004, Doc. No. 79, Ex. O.; *see also* Detective Dep.

─────────────────

[8] Plaintiff denies doing this, but it is undisputed that the caregivers reported the alleged
incident to Detective Johnson.

153-54, 157.)  That day, Detective Johnson came to her place of employment to arrest Plaintiff.
(Pl.'s Dep. 157-60, 177-78.)  Upon seeing Detective Johnson, Plaintiff "went right to the phone."
(*Id.* at 178.)  Detective Johnson "slammed [Plaintiff's] hand on the phone" and "with a grin"
said, "uh-uh, Merry Christmas, I have a Christmas present for you."  (*Id.* at 178, 180.)  Plaintiff
could not make the telephone call and was taken into custody.  (*Id.* at 180.)  Plaintiff was
released on December 28, 2004.[9]  (*Id.* at 370.)

### H.    Plaintiff's Cell Phone Records Arrive

On January 10, 2005, Detective Johnson received Plaintiff's cell phone records from
Cingular Wireless.  (*See* Search Warrant and Cell Phone Records, Doc. No. 79, Ex. P.)  He
learned that from September 1, 2004, through December 10, 2004, a total of 56 calls were made
from Plaintiff's cell phone to Millet's cell phone.  (*See* Crim. Compl., Jan. 12, 2005, Doc. No.
79, Ex. M.)  Included in those calls "were calls made during the overnight hours and [a] call [to
Millet that] match[ed] up with the alleged [death] threat call" that Millet reported.  (*Id.*)  On
January 12, 2005, after receiving this information, Detective Johnson initiated the third and final
criminal proceeding against Plaintiff.  (*See* Crim. Compl., Jan. 12, 2005, Doc. No. 79, Ex. M.)
He charged Plaintiff with making terroristic threats and engaging in harassment against Millet.
These charges did not result in a separate arrest.[10]  (*See id.*)

---

[9] The circumstances surrounding Plaintiff's incarceration over the Christmas 2004
holiday are addressed in a separate Memorandum.

[10] There is some uncertainty concerning the timing of the charges that relate to Millet's
report.  Detective Johnson testified that Plaintiff was charged with stalking and harassment
during the December 22, 2004 arrest and that he "used the opportunity of [Plaintiff] being in the
building [for violation of the PFA order] to just initiate the Title 18 case [for stalking and
harassment]."  (Detective Johnson Dep. 157.)  It is undisputed that Plaintiff was not arrested a
separate time in connection with Millet's charges.

## I.        All Charges Against Plaintiff Are Dismissed

In January 2005, "[t]he complaints on the PFAs became moot once they were mutually dismissed."  (Doc. No. 77-2 at 10.)  The reason for the dismissals was that "[Kuhfuss] didn't want to proceed."  (Detective Johnson Dep. at 88; *see also id.* at 164, testifying that "[a]t some point in time [the preliminary hearings] became moot because the PFAs were dismissed.")  With respect to the criminal charges filed against Plaintiff based upon the alleged harassment and threats made against Millet, Detective Johnson reached an agreement with Plaintiff's counsel to provide for "a cooling off period and dismissal of the charges if no further incidents occurred." (Doc. No. 102 at 2.)  Detective Johnson testified as follows:

> We worked out between me and [Plaintiff's] attorney a 90-day continuance cooling off period, trial period, whatever you want to label that time to see if [Plaintiff's] behavior and the activity would cease and that we would readdress the matter.

(Detective Johnson Dep. 162; *see also* Arrest Sheet, Oct. 26, 2004, Doc. No. 124-2 at 54, noting a 90-day continuance in which complaint would be withdrawn if no further contact).  Since there was no evidence of reports that Plaintiff engaged in similar behavior during the 90-day period, the charges were not prosecuted.

## II.    PROCEDURAL BACKGROUND

On April 21, 2006, Plaintiff filed a Complaint alleging numerous civil rights violations against the moving Defendants in connection with her multiple arrests and criminal prosecutions. (*See* Compl., Doc. No. 1.)[11]  Plaintiff thereafter filed an Amended Complaint.  (*See* Am. Compl.,

_____

[11] It appears that Plaintiff has filed six other lawsuits.  Those lawsuits are not related to the instant matter.  Plaintiff brought four prior personal injury lawsuits – including one lawsuit relating to burns she allegedly suffered from a coffee machine at a Burger King franchise – one sexual harassment lawsuit, and one lawsuit the subject of which is unknown.  (*See* Doc. No. 112-2 at 2.)  Plaintiff testified at her deposition about two prior lawsuits – the Burger King lawsuit,

Doc. No. 21.)  Plaintiff's Amended Complaint contains five counts, only four of which relate to the moving Defendants.  (*See id.*)  In Count I, Plaintiff asserts multiple civil rights claims against Detective Johnson and Kehrle pursuant to 42 U.S.C. § 1983.[12]  (*See* Am. Compl. ¶¶ 93-99.)  In Count II, Plaintiff asserts claims of assault and battery against Detective Johnson, Deputy Chief Johnson, and Kehrle.  (*See id.* ¶¶ 101-104.)  In Count III, Plaintiff asserts claims of false imprisonment and false arrest against Detective Johnson, Deputy Chief Johnson, and Kehrle.[13] In Count IV, Plaintiff asserts a claim of intentional infliction of emotional distress against Detective Johnson, Deputy Chief Johnson, and Kehlre.  (*See* Am. Compl. ¶¶ 108-112.) Plaintiff's claim of intentional infliction of emotional distress in Count IV was dismissed with prejudice by stipulation of the parties on August 10, 2007.  (*See* Doc. No. 39.)

Defendants Detective Johnson, Deputy Chief Johnson, and Kehrle filed the instant Motions for Summary Judgment on Plaintiff's Amended Complaint in its entirety.

## III.    LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine

---

and the sexual harassment lawsuit – but could not remember the others.  (Pl.'s Dep. 197-200.)

[12] On November 26, 2008, Plaintiff's constitutional claims asserted against Deputy Chief Johnson were dismissed with prejudice by stipulation of the parties.  (*See* Doc. No. 86; *see also* Doc. No. 94 at 1.)  Plaintiff's constitutional claims asserted against the remaining Defendants, GEO Group, Inc., and the Delaware County Prison, are addressed in a separate Memorandum.

[13] Plaintiff's false imprisonment and false arrest claims asserted against the remaining Defendants, GEO Group, Inc., and the Delaware County Prison, are addressed in a separate Memorandum.

issue of material fact exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment bears the initial burden of demonstrating that there are no facts supporting the nonmoving party's legal position. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Once the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (explaining that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The nonmoving party "cannot 'rely merely upon bare assertions, conclusory allegations or suspicions' to support its claim." *Fin. Software Sys., Inc., v. Lecocq*, No. 07-3034, 2008 WL 2221903, at *2 (E.D. Pa. May 29, 2008) (*quoting Fireman's Ins. Co. v. DeFresne*, 676 F.2d 965, 969 (3d Cir. 1982)). Rather, the party opposing summary judgment must go beyond the pleadings and present evidence through affidavits, depositions, or admissions on file to show that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. When deciding a motion for summary judgment, we must view facts and inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995). However, we must not resolve factual disputes or make credibility determinations. *Siegel Transfer*, 54 F.3d at 1127.

## IV.     DISCUSSION

### A.     Count I:  Civil Rights Violations

In Count I, Plaintiff alleges that Detective Johnson and Sergeant Kehrle deprived her of (1) freedom of speech and freedom to petition for redress of grievances under the First

Amendment;[14] (2) freedom from unreasonable and warrantless arrest, search, and seizure without

probable cause (i.e, "freedom from unlawful arrest"), including malicious prosecution, under the

Fourth Amendment; (3) freedom from unreasonable or excessive bail, cruel and unusual

punishment, and excessive force;[15] and (4) "due process of the law."  (Am. Compl. ¶ 99.)

---

[14] Detective Johnson and Sergeant Kehrle contend that "there is no allegation by . . . Plaintiff in her First Amended Complaint or her deposition testimony which sets forth any factual scenario which could possibly give rise to a First Amendment violation" based upon freedom of speech or freedom to petition for redress of grievances.  (Doc. No. 77-2 at 17.)  They contend that "Plaintiff's testimony establishes that she clearly had access to the courts and counsel throughout the process stemming from the three separate criminal complaints filed against her," and that Plaintiff "never complained . . . about the conduct of [Detective Johnson] at any time during the proceedings."  (Doc. No. 77-2 at 17.)  Plaintiff does not dispute Defendants' contentions.  (*See, e.g.*, Pl.'s Dep. 319-20, admitting that she was before a judge within "a couple of hours" of her arrest on December 22, 2004.)  Indeed, in Plaintiff's omnibus responses to Defendants' motions, Plaintiff does not respond to this aspect of Defendants' Motion except as it relates to Plaintiff's claim for malicious prosecution.  (*See* Doc. Nos. 90, 94.)  We address Plaintiff's malicious prosecution claim, *infra*.  Since Plaintiff does not argue that there is a genuine issue of fact regarding the remainder of these claims, she has abandoned them and we will not address them.  *See Ankele v. Hambrick*, 286 F. Supp. 2d 485, 496 (E.D. Pa. 2003) (granting summary judgment because plaintiff failed to address one of the defendant's arguments in his summary judgment motion, which resulted in the plaintiff's waiver of the opportunity to contest summary judgment on that ground); *Evans v. Nine W. Group, Inc.*, No. 00-4850, 2002 U.S. Dist. LEXIS 6427, at *12-13 (E.D. Pa. Apr. 15, 2002) (finding that the plaintiff abandoned a claim by failing to assert the claim in her opposition to defendant's summary judgment motion and stating, "[u]nder analogous circumstances, courts both within and beyond the Third Circuit routinely have held the claim at issue to have been abandoned"); *Hackett v. Cmty. Behavioral Health*, No. 03-6254, 2005 U.S. Dist. LEXIS 8410, at *23 (E.D. Pa. May 6, 2005) (finding that the plaintiff only addressed her retaliation claims but not her race and gender discrimination claims and that she had therefore abandoned the latter claims); *see also Player v. Motiva Enters. LLC*, 240 Fed App'x 513, 522 n.4 (3d Cir. 2007) (unpublished opinion) (noting that the plaintiff could not argue on appeal that the district court failed to consider evidence where the plaintiff "never argued . . . that there was a genuine issue of material fact" regarding the claim).

[15] Plaintiff does not advance any arguments in her omnibus responses to Defendants' motions in support of her claims of cruel and unusual punishment, excessive bail, or excessive force.  Defendants contend and Plaintiff does not dispute that "she can present no Eighth Amendment claim" for cruel and unusual punishment and excessive bail.  (*See* Doc. No. 77-2 at 18.)  Defendants further contend and Plaintiff does not dispute that the officers' actions "do not

Plaintiff asserts that "[a]ll of these rights are secured to Plaintiff by provisions of the First,

Fourth, Eighth and Fourteenth Amendments to the United States Constitution and by 42 U.S.C.

§[§] 1983 and 1988." (*Id.* ¶ 100.)

> ### 1.     *Freedom from Unlawful Arrest*

Plaintiff maintains that her constitutional rights were violated on November 13, 2004,

"when she was barred from leaving after her vehicle was blocked in, and when she was coerced

into getting into the ambulance as an alternative to arrest." (*Id.*)  Plaintiff maintains that her

arrest lacked probable cause since Plaintiff "was entitled to be [on the Kuhfuss premises] by

virtue of the court order allowing her to be present at the home accompanied by a police officer

for the purpose of gathering her and her children's belongings." (*Id.* at 13.)  Plaintiff further

maintains that "the charges brought against Plaintiff by [Detective] Johnson . . . were also known

to be without probable cause." (*Id.* at 13-14.)  Based on these facts, Plaintiff presents claims of

(a) selective prosecution; (b) malicious prosecution; and (c) wrongful arrest in violation of her

constitutional rights.  (*Id.*)  Plaintiff asserts these claims against Detective Johnson and Kehrle.

> #### a.     *Selective Prosecution*

Plaintiff maintains that "her prosecution was selective and unfairly biased, as similar

PFA violations committed by Kuhfuss were not prosecuted." (Doc. No. 90 at 12.)  Plaintiff cites

the case of *Wayte v. United States*, 470 U.S. 598, 608 (1985), for the proposition that "the

---

establish any basis for a claim of excessive force [under the Fourth Amendment]." (Doc. No.
77-2 at 20.)  Since Plaintiff does not argue that there is a genuine issue of fact regarding these
claims, we need not address them.  *See Ankele*, 286 F. Supp. 2d at 496; *Evans*, 2002 U.S. Dist.
LEXIS 6427, at *12-13; *Hackett*, 2005 U.S. Dist. LEXIS 8410, at *23; *see also Player*, 240 Fed
App'x at 513.  We do, however, address Plaintiff's excessive force claim as it relates to her state
law claim of battery by a police officer.

decision to prosecute may not be 'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification' . . . including the exercise of protected statutory and constitutional rights." (Doc. No. 90 at 16.) Plaintiff contends that she "was similarly situated with regard to PFA violations as was Kuhfuss" but that "Kuhfuss was not similarly prosecuted" since he "associated often, both professionally and socially, with emergency and protective services personnel. . . ." (*Id.*) Plaintiff argues that "[i]t is Kuhfuss's First Amendment right to associate with said individuals as a matter of personal expression" and "it is also Plaintiff's right *not* to be singled out for prosecution by this group. . . ." (*Id.*) Detective Johnson and Kehrle contend that Plaintiff's prosecution was not selective or unfairly biased since Plaintiff, unlike Kuhfuss, never complained or asked police to enforce the PFA.

A claim of selective prosecution requires that plaintiffs show two elements:

First, they must provide evidence that persons similarly situated have not been prosecuted. Second, they must show that the decisions were made on the basis of an unjustifiable standard . . . such as race, religion, or other arbitrary classification . . . or to prevent the . . . exercise of a fundamental right.

*Kirkland v. Morgievich*, No. 04-1651, 2008 WL 5272028, at *8 (D.N.J. Dec. 16, 2008) (*citing Gov't of Virgin Islands v. Harrigan*, 791 F.2d 34, 36 (3d Cir. 1986) (internal citations and quotations omitted)); *see also Jordan v. Caruso*, No. 06-1097, 2008 WL 5085154, at *15 (E.D. Mich. Sept. 25, 2008) ("Selective prosecution is permissible as long as it is not based on clearly impermissible grounds such as discrimination on the basis of race, religion, the exercise of First Amendment rights, or bad faith.") (*citing Ciechon v. City of Chicago*, 686 F.2d 511, 523 n.16 (7th Cir. 1982)). Thus, "[i]n order to succeed under a claim of selective prosecution, [P]laintiff will have to prove that [D]efendants intentionally and purposefully discriminated against [her] by failing to prosecute others similarly situated." *Johnson v. City of Chester*, No. 89-1530, 1989

WL 129705, at *1 (E.D. Pa. Oct. 27, 1989) (Pollak, J.) (*citing United States v. Torquato*, 602 F.2d 564, 571 (3d Cir. 1979), *cert. denied*, 444 U.S. 941 (1979)); *see also Salem Blue Collar Workers Ass'n v. City of Salem*, 33 F.3d 265, 272 (3d Cir. 1994), *cert. denied*, 513 U.S. 1152 (1995) (dismissing the plaintiffs' selective prosecution claim because they had not met their burden of offering evidence that the defendant failed to prosecute other similarly situated persons).

When "[t]he allegations in the Complaint are entirely focused on the actions of the [p]olice, not the prosecutor," the claim "can only be construed as a selective enforcement claim." *Kirkland*, 2008 WL 5272028, at *8. "Confusing selective enforcement and selective prosecution claims is not uncommon." *Id.* at *8 n.6; *see also Dique v. Mulvey*, No. 04-0563, 2008 WL 1882856, at *8 n.6 (D.N.J. Apr. 24, 2008) (noting that "[t]o the extent that both plaintiff and defendants mixed up selective enforcement with selective prosecution, their arguments were not helpful to the Court"). "A plaintiff who asserts an equal protection claim based on selective enforcement must demonstrate:  (1) that others similarly situated were selectively treated; and (2) that this selective treatment was based on an 'unjustifiable standard, such as race, or religion, or some other arbitrary factor, . . . or to prevent the exercise of a fundamental right.'" *McDuffy v. Marsico*, 572 F. Supp. 2d 520, 526 (D. Del. 2008) (*citing Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005)) (citations omitted).

The allegations in Plaintiff's Complaint concern the conduct of police rather than the prosecutors.  Thus, Plaintiff's claim is one of selective enforcement rather than selective prosecution.  *See Kirkland*, 2008 WL 5272028, at *8.  However, under either construction Plaintiff's claim fails because she was not similarly situated to Kuhfuss.  It is undisputed that

19

Kuhfuss (himself, and also through his caretakers) made complaints against Plaintiff that prompted Defendants to take action.  Plaintiff, on the other hand, did not complain to Defendants that Kuhfuss had violated the PFA order and never attempted to have the PFA order enforced against Kuhfuss.[16]  Since Plaintiff never attempted to enforce the PFA, Plaintiff and Kuhfuss were not similarly situated.  Summary judgment is therefore appropriate on Plaintiff's selective enforcement / selective prosecution claims.[17]  *See Rodriguez v. United States*, No. 94-2777, 1995

---

[16] It is worth noting in this regard that Kuhfuss suffered an incapacitating stroke on November 10, 2004.  "Kuhfuss . . . could barely communicate.  The only real thing that he could do was he could nod his head, and he couldn't even write."  (Detective Johnson Dep. 84.)  Plaintiff testified that Kuhfuss could answer her questions with "negative sounds or positive sounds."  (Pl.'s Dep. 170-71.)  Detective Johnson treated Kuhfuss "as a special victim with diminished capacity."  (Detective Johnson Dep. 82.)

[17] Plaintiff appears to be attempting to make a selective enforcement argument based on the First Amendment.  Plaintiff states that, "[i]t is Kuhfuss's First Amendment right to associate with [fire fighters and police officers] as a matter of personal expression.  However, it is also Plaintiff's right *not* to be singled out for prosecution by this group solely because she has spurned one of its members . . . ."  (Doc. No. 94 at 16.)  In the next sentence, Plaintiff states that in order to establish a prima facie case of selective enforcement, she must prove that "the Government's discriminatory selection was based on impermissible grounds such as race, religion, or the exercise of First Amendment rights."  (*Id.*)  We understand Plaintiff's argument to mean that she has a First Amendment right not to associate with the group of fire fighters and police officers and that her exercise of that right cannot provide the basis for her being prosecuted.  To the extent that Plaintiff relies on the exercise of her First Amendment freedom of association as the basis for a selective enforcement claim, the claim must fail since there is no evidence that her association, or lack thereof, with fire fighters and police officers was expressive in nature.  *See Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000) ("The First Amendment's protection of expressive association is not reserved for advocacy groups.  But to come within its ambit, a group must engage in some form of expression, whether it be public or private."); *Gruenke v. Seip*, 225 F.3d 290, 308 (3d Cir. 2000) ("While the Constitution also guards those associational activities necessary to further other activities, such as speech and assembly [that] the First Amendment directly protects, purely social rights to association lack this same heightened constitutional protection."); *Owens v. Ventura County Super. Ct.*, 42 F. Supp. 2d 993, 999 (C.D. Ca. 1999) (holding that selective prosecution of a police officer on the ground that he was a police officer did not violate equal protection since, inter alia, the association was "a commercial association rather than an activity of the type protected by the First Amendment") (citations omitted).

WL 625637, at *4 (E.D. Pa. Oct. 24, 1995) (granting summary judgment in favor of the defendant on a selective prosecution claim where the plaintiff failed "to prove that persons similarly situated ha[d] not been prosecuted and that prosecutors made the decision to prosecute on the basis of an unjustifiable standard").

<em>b.     Malicious Prosecution</em>

"To prevail in a Section 1983 malicious prosecution action, a plaintiff must show [that] (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *DiBella v. Borough of Beachwood*, 407 F.3d 599, 601 (3d Cir. 2005) (*citing Estate of Smith v. Marasco*, 318 F.3d 497, 521 (3d Cir. 2003)). A criminal proceeding ends in the plaintiff's favor for purposes of malicious prosecution by "(a) a discharge by a magistrate at a preliminary hearing; (b) the refusal of a grand jury to indict; (c) the formal abandonment of the proceedings by the public prosecutor; (d) the quashing of an indictment or information; (e) an acquittal; or (f) a final order in favor of the accused by a trial or appellate court." *Donahue v. Gavin*, 280 F.3d 371, 383 (3d Cir. 2002) (*citing* Restatement (Second) of Torts § 659 (1976)). Although "a grant of *nolle prosequi*" – the public prosecutor's formal abandonment of criminal proceedings – "can be sufficient to satisfy the favorable termination requirement for malicious prosecution, . . . not all cases where the prosecutor abandons criminal charges are considered to have terminated favorably." *Donahue v. Gavin*, 280 F.3d 371, 383 (3d Cir. 2002) (*citing Hilfirty v. Shipman*, 91 F.3d 573, 579-80 (3d Cir. 1996)). "A *nol pros* signifies termination of charges in

21

favor of the accused *only* when their final disposition is such as to indicate the innocence of the accused." *Id.* (emphasis added and citation omitted). Thus, the Third Circuit has stated that a § 1983 malicious prosecution plaintiff "must be innocent of the crime charged in the underlying prosecution." *Id.* (*citing Hector v. Watt*, 235 F.3d 154, 156 (3d Cir. 2000)).

Here, Plaintiff cannot prove a claim of malicious prosecution because the criminal proceedings did not end in her favor. Although Plaintiff was not convicted of the underlying crimes, neither was she exonerated in a way that "indicate[s] [her] innocence." *See Donohue*, 380 F.3d at 383. With respect to the criminal charges filed against Plaintiff for the two violations of the PFA orders, those charges were dismissed. Detective Johnson testified that "[a]t some point in time [the preliminary hearings] became moot because the PFAs were dismissed." (Detective Dep. 164.) Detective Johnson further testified that the reason the PFAs were dismissed was because "[Kuhfuss] didn't want to proceed," not because Plaintiff was innocent. (*Id.* at 88.) This testimony is uncontroverted and reveals an abandonment of the criminal charges, not unlike a grant of *nolle prosequi*. With respect to the criminal charges filed against Plaintiff due to harassment and threats made against Millet, Defendants argue that "Detective Johnson made it clear that the dismissal of those charges was based upon an agreement worked out with Plaintiff's counsel to provide for a cooling off period and dismissal of the charges if no further incidents occurred." (Doc. No. 102 at 2.) Detective Johnson testified as follows:

> We worked out between me and the criminal defense attorney a 90-day continuance cooling off period, trial period, whatever you want to label that time to see if [Plaintiff's] behavior and the activity would cease and that we would readdress the matter.

(Detective Dep. 162.) Plaintiff argues that "all charges pending against [Plaintiff] were

dismissed as a result of the Commonwealth's failure to produce any evidence supporting them."

(Doc. No. 90 at 10.)  However, Plaintiff cites nothing in the record to support this contention.

Our review of record reveals that Plaintiff testified that "three or four" preliminary hearings had

to be continued after Millet failed to appear:

> Q:   Do you know if any of [the preliminary hearings] were continued at the
>      request of Lauri Millet?
> A:   That's really undefined.  I would go to court and then she wouldn't show up,
>      so I don't know if they're considered continuances because we had to
>      continue it because she didn't show up.
> Q:   How many times did she not show up?
> A:   Three or four.

(Pl.'s Dep. 189.)  The granting of "three of four" continuances is not a dismissal.  Plaintiff cites

to no evidence, and we are aware of none, that would support an inference that the Millet

charges were dismissed due to lack of evidence of Plaintiff's guilt.  In fact, Plaintiff's cell phone

records and Millet's phone records belie such an assertion.

An objective review of the record reveals that the evidence related to Plaintiff's

interactions with Kuhfuss and Millet does not lead to the conclusion that Plaintiff was innocent.

Regarding the November 18, 2004 criminal complaint, Minster gave a statement to police that

Plaintiff "came to the kitchen door" of the Kuhfuss residence in violation of the PFA order and

spoke with Minster, a protected person under the order.  (*See* Ex. S.)  Regarding the December

22, 2004 criminal complaint, Plaintiff admitted during her deposition that she called Kuhfuss on

multiple occasions in December 2004 even though the PFA prohibited such contact.  (Pl.'s Dep.

170.)  Plaintiff understood that the PFAs "disallowed both of [them] to talk to each other," but

Plaintiff justified her contact since Kuhfuss made the first call and Plaintiff merely called him

back.  (*See id.* at 169-73.)  However, Plaintiff also testified that in December 2004, she "picked

[Kuhfuss] up at [a] church" and "took him to the CVS on Baltimore Pike."  (Pl.'s Dep. 246,

248.)  Telephone records that Detective Johnson obtained with a subpoena establish numerous

calls from Plaintiff's cell phone to the Kuhfuss residence during the time period.  (*See* Doc. No.

77-2 at 22; Detective Johnson Dep. 206-08, 224-27).  In addition, there were numerous emails

exchanged between Plaintiff and Kuhfuss.  (*See* Detective Johnson Dep. 215-17, 219).

Plaintiff's cell and work numbers appeared in the Caller ID display at Kuhfuss's house.  (*See*

Crim. Compl., Dec. 22, 2004, Doc. No. 79, Ex. O.)  Plaintiff's multiple contacts with Kuhfuss in

violation of the PFA order do not "indicate [Plaintiff's] innocence" as to the December 22, 2004

criminal complaint.  *See Donohue*, 380 F.3d at 383.  Finally, regarding the January 12, 2005

criminal complaint, Detective Johnson reviewed Plaintiff's cell phone records and found that 56

calls were made to Millet's cell phone from Plaintiff's cell phone, including a call on the date

and time that Millet alleged receiving threats.  (*See* Ex. M; *see also* Doc. No. 102 at 4.)

Even if one were to somehow conclude that the criminal proceedings ended in Plaintiff's

favor, Plaintiff's malicious prosecution claim still fails because Defendants had probable cause

to initiate the criminal proceedings.  *See DiBella*, 407 F.3d at 601 (noting that the malicious

prosecution plaintiff must also show that "the proceeding was initiated without probable cause").

"Probable cause is defined as reasonable ground for the belief of guilt supported by less than

prima facie proof but more than mere suspicion."  *United States v. $734,578.82 in U.S.*

*Currency*, 286 F.3d 641, 648 (3d Cir. 2002); *see also United States v. Burton*, 288 F.3d 91, 98

(3d Cir. 2002) (*citing Orsatti v. N.J. State Police*, 71 F.3d 480, 482-83 (3d Cir. 1995) ("Probable

cause . . . requires more than mere suspicion; however, it does not require that the officer have

evidence sufficient to prove guilt beyond a reasonable doubt.").  "The facts and observations

24

must be analyzed 'through the lens of the [officer's] significant experience with similar transactions.'"  *Burton*, 288 F.3d at 99 (citation omitted).

Here, Plaintiff does not dispute that Minster made the statement to police that prompted the November 18, 2004 criminal complaint.  Minster's statement to police that Plaintiff had appeared at the kitchen door and spoke to Minster in violation of the PFA order provides probable cause to initiate the criminal proceedings.[18]  It is undisputed that Minster made the complaint and gave the statement to police that prompted Plaintiff's arrest.

Plaintiff also does not dispute that the individuals taking care of Kuhfuss made reports to police that prompted the December 22, 2004 criminal complaint.  Kuhfuss's caregivers reported numerous contacts, many of which Plaintiff admitted to making.  (Pl.'s Ex. H, Doc. No. 90-8.)  Plaintiff argues that "[Detective Johnson's] Affidavit attached to the [December 22, 2004] Criminal Complaint contained statements that were untrue, including the statement that Plaintiff "was viewed in front of the house in a vehicle that fled when observed by the two witnesses."  (Doc. No. 94 at 8; Crim. Compl., Dec. 22, 2004, Doc. No. 79, Ex. O.)  Plaintiff's argument is disingenuous.  It is undisputed that the witnesses reported seeing Plaintiff to Detective Johnson.  The fact that Detective Johnson investigated further and concluded that it was not Plaintiff has no bearing on the probable cause that existed at the time of the witnesses' report.  Even without the witness report, the police had additional, overwhelming probable cause to initiate criminal proceedings and to effect Plaintiff's arrest.

---

[18] Plaintiff testified that "any and all information that was given, made up, exchanged, could have been in a vindictive nature."  (Pl.'s Dep. 175.)  Even if Minster had "made up" her allegations "in a vindictive nature," there is no evidence in the record that Defendants were aware of any vindictiveness when they initiated the proceedings and effected Plaintiff's arrest.  (*See id.* at 226-27.)

Finally, Plaintiff does not dispute that Detective Johnson obtained cell phone records that prompted the January 12, 2005 criminal complaint.  Those records along with Millet's report to the police were enough to provide Defendants with probable cause.  In addition, Millet provided a statement to police that Plaintiff had threatened her.  (*See generally* Millet Dep. 38-40.) Clearly, there was probable cause to initiate the criminal proceedings.

Considering all of the evidence in this record, one cannot reasonably conclude that the criminal proceedings, which Plaintiff alleges were maliciously initiated against her, "ended in [Plaintiff's] favor."  Nor can one reasonably conclude that the criminal proceedings were initiated without probable cause.  *See DiBella*, 407 F.3d at 601; *see also Molina v. City of Lancaster*, No. 00-3508, 2002 WL 485595, at *4 (E.D. Pa. Mar. 28, 2002) (granting summary judgment in favor of defendants where the "record [was] devoid of any evidence to support [the plaintiff's] allegation that the . . . charges against him were dismissed for lack of evidence"). Thus, summary judgment in favor of Defendants is appropriate on Plaintiff's § 1983 malicious prosecution claim.

### c.     *Wrongful Arrests without Probable Cause*

Plaintiff alleges that Detective Johnson and Sergeant Kehrle arrested her without probable cause.  First, Plaintiff alleges that on November 13, 2004, she was "barred from leaving [the Kuhfuss driveway] after her vehicle was blocked in" and was ultimately taken away by ambulance.  Next, Plaintiff alleges that on November 21, 2004, Detective Johnson arrested her without probable cause at her mother's house for violating the PFA.  Finally, Plaintiff alleges that on December 22, 2004, she was arrested without probable cause at her place of employment, which resulted in Plaintiff's five-day imprisonment over the holidays.  The record does not

support Plaintiff's assertions that the arrests lacked probable cause.

i. The Driveway Incident

It is undisputed that pursuant to a court order Plaintiff was permitted to visit the Kuhfuss residence and retrieve personal items when accompanied by a police officer.  Plaintiff made arrangements with the police to retrieve her personal items on November 13, 2004, and arrived at the premises for that purpose.  Sergeant Kehrle spoke with Plaintiff in the driveway and then went inside the Kuhfuss home, where he spoke with Minster.  Minster was about to leave for the hospital to visit Kuhfuss.  (Kehrle Dep. 13.)  Since nobody would be home, Minster "asked that [Kehrle] tell [Plaintiff] to come back at a mutually agreeable time."  (*Id.*)  The PFA order did not grant Plaintiff an absolute right to be present at Kuhfuss's house on November 13th.  (*See* Doc. No. 80, Ex. I.)  The police retained an element of discretion as to the precise timing and nature of Plaintiff's visit.  Sergeant Kehrle exercised this discretion and decided to reschedule Plaintiff's visit for another time.  He told Plaintiff that she had to leave.  (Pl.'s Dep 133-34; Kehrle Dep. 17.)  Plaintiff refused to obey the Sergeant's directive.  (Pl.'s Dep. 135-36.)  At that point, not only was Plaintiff in violation of the PFA order, she was also a defiant trespasser.  *See* 18 Pa. Cons. Stat. Ann. § 3503(b) (providing that a person commits an offense of criminal trespass as a defiant trespasser "if, knowing that he is not licensed or privileged to do so, he enters or remains in any place as to which notice against trespass is given by . . . actual communication to the actor").

Plaintiff nevertheless claims that Defendants unlawfully prevented her from leaving the premises by blocking her car in and by having her transported by ambulance to the hospital. (*See* Doc. No. 94 at 13-14.)  It is undisputed that Kehrle asked Plaintiff to leave and that Plaintiff

27

refused.  There is no evidence that Plaintiff at any time tried to leave the driveway or that she ever intended to leave the driveway.  Even if Kehrle later "seized" Plaintiff by giving her the choice of being arrested or going to the hospital, the seizure is supported by probable cause:  the PFA order forbade Plaintiff from being present at the Kuhfuss residence.  Kehrle was aware of the outstanding PFA order.  (*See* Kehlre Dep. 25; *see also* Doc. No. 77-2 at 29.)  Minster, a protected person under the PFA, wanted Plaintiff to leave so that she could visit Kuhfuss in the hospital.  Since Plaintiff's continued presence and refusal to leave the residence violated an outstanding PFA, and since Minster, a protected person, asked that Plaintiff leave, a seizure of Plaintiff was proper.

Plaintiff's physical condition provided additional justification for a seizure.  Plaintiff was observed "breathing erratically" and appeared to be having a panic attack.  She was "very upset." Her own daughter was attempting to calm her down.  Sergeant Kehrle was becoming concerned about her ability to drive.  He gave her the option of being arrested or going to the hospital in an ambulance.  She chose the ambulance.  To the extent that such an option constituted a seizure of Plaintiff, it was based upon probable cause.

### ii.      The November 21, 2004 Arrest

It is undisputed that Minster gave a statement to police that Plaintiff appeared at the Kuhfuss residence in violation of the PFA order.  This resulted in Plaintiff's November 21, 2004 arrest.  As discussed above, Minster's complaint clearly provided probable cause to initiate criminal proceedings and to arrest Plaintiff.

### iii.      The December 22, 2004 Arrest

Regarding Plaintiff's arrest on December 22, 2004, at her place of employment, Plaintiff

admits that she had multiple contacts with Kuhfuss in violation of the PFA.  Indeed, she called

him "as many as 50 times" per week during the month of December.  (Pl.'s Dep. 252.)

Plaintiff's justification – that she was merely returning Kuhfuss's calls, or that the contacts

"went both ways" – is not a defense.  For the same reasons that the witness reports and other

evidence of Plaintiff's multiple contacts with Kuhfuss constituted sufficient probable cause, in

the context of malicious prosecution, those contacts constituted probable cause to effect

Plaintiff's arrest.

For all of these reasons, summary judgment must be entered in favor of Defendants on

Plaintiff's unlawful arrest claims under the Fourth Amendment.

        2.     *Due Process*

Plaintiff alleges in her Amended Complaint that Defendants violated her right to "due

process."  (*See* Compl. ¶ 99.)  Plaintiff does not specify whether she refers to substantive due

process or procedural due process.  In her summary judgment briefing, Plaintiff's only mention

of "due process" appears in the context of her argument concerning the Fourth Amendment right

to be free from malicious prosecution and incarceration.  (*See* Doc. No. 94 at 12.)  Plaintiff

concedes that the framework for analyzing a substantive due process claim is set forth in

*Albright v. Oliver*, 510 U.S. 266, 273 (1994).  In *Albright*, the Supreme Court held that where "a

particular Amendment provides an explicit textual source of constitutional protection against a

particular sort of government behavior, that Amendment, not the more generalized notion of

'substantive due process,' must be the guide for analyzing such a claim."  *Id.* (internal quotations

and citation omitted).  Here, the Fourth Amendment provides the "explicit textual source of

constitutional protection" against the government behavior of which Plaintiff complains.

Plaintiff does not dispute that her claims "fall under the umbrella of the Fourth Amendment that may involve questions with respect to the reasonableness of [Plaintiff's] seizure and whether probable cause existed." (Doc. No. 77-2 at 16.)  Indeed, Plaintiff cites *Albright* for the proposition that a claim under § 1983 "asserting [the] right to be free from prosecution except under probable cause is a claim properly brought alleging violation of the Fourth Amendment and not Fourteenth Amendment substantive due process." (Doc. No. 94 at 12.)  We agree that the Fourth Amendment – and not "a generalized notion of substantive due process" – provides the appropriate framework for analyzing Plaintiff's claims.  *See Albright*, 510 U.S. at 273. Accordingly, Plaintiff's substantive due process claim will be dismissed.

To the extent that Plaintiff asserts a procedural due process claim, this claim must also fail.  To state a claim under § 1983 for deprivation of procedural due process, a plaintiff must allege that (1) she was deprived of an individual interest included within the Fourteenth Amendment's protection of "life, liberty, or property," and (2) the procedures available to her did not provide "due process of law."  *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006).  The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner."  *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) (*quoting Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  A state provides constitutionally adequate procedural due process when it provides reasonable post-deprivation remedies. *DeBlasio v. Zoning Bd. of Adjustment*, 53 F.3d 592, 597 (3d Cir. 1995), *overruled on other grounds sub nom*, *United Artists Theatre Cir., Inc., v. Twp. of Warrington*, 316 F.3d 392 (3d Cir. 2003).

Plaintiff cannot show that the available procedures failed to afford her due process of

law.  The charges against her were dismissed, and there is no evidence that Plaintiff was ever

denied access to counsel or the courts.[19]  Moreover, Plaintiff cannot assert a procedural due

process claim based on failure to enforce the PFA orders against Kuhfuss since Plaintiff had no

protected property right to police protection.  *See Burrella v. City of Phila.*, 501 F.3d 134,

141-46 (3d Cir. 2006) (finding no protected property right to police protection under

Pennsylvania law and therefore no basis for procedural due process claim for failure to enforce a

PFA order).[20]

---

[19] In any event, Plaintiff clearly bases her claim on alleged Fourth Amendment violations and arrest without probable cause, not procedural due process.  *See Swedron v. Borough*, No. 08-1095, 2008 WL 5051399, at *6 (W.D. Pa. Nov. 21, 2008) (dismissing procedural due process claim "along with the substantive due process claim" where "the gravamen of [the plaintiff's] lawsuit [wa]s so clearly premised on a First and/or Fourth Amendment violation based upon his alleged malicious prosecution and arrest without probable cause" (*citing Merkle v. Upper Dublin School Dist.*, 211 F.3d 782, 792-93 (3d Cir. 2000))).

[20] Finally, to the extent that Plaintiff alleges that the moving Defendants conspired with other Defendants in this case to bring about Plaintiff's incarceration over the Christmas 2004 holiday in violation of her civil rights, Plaintiff's claim fails for at least two reasons.  (Am. Compl. ¶ 73.)  First, Plaintiff does not mention – much less argue – a conspiracy claim in her omnibus responses to Defendants' motions for summary judgment.  (*See* Doc. Nos. 90, 94.) Plaintiff's response to Defendant's motion *in limine* to preclude conspiracy evidence adds nothing.  (*See* Doc. No. 121.)  The claim is therefore abandoned.  *See, e.g.*, *Ankele*, 286 F. Supp. 2d at 496.  Second, Plaintiff cannot establish the elements of a conspiracy claim:  (1) a conspiracy; (2) motivated by racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States.  *Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997).  Plaintiff proffers no evidence that Detective Johnson, Sergeant Kehrle, and Deputy Chief Johnson conspired against her because of race-based or class-based animus.  Plaintiff admitted during her deposition that the only evidence linking her Christmas 2004 incarceration with the moving Defendants is the comment by Detective Johnson that he "has a Christmas present for [her]."  (Pl.'s Dep. 361-62.)  The comment does not link Detective Johnson to any of the other Defendants in this case.  The moving Defendants are therefore entitled to summary judgment on any conspiracy claims.

B.     **Count II:  Assault and Battery Claims under Pennsylvania Law**

In Count II, Plaintiff states claims of assault and battery against Detective Johnson,

Deputy Chief Johnson, and Kehrle.  (*See* Compl. ¶¶ 101-104.)  In support of these claims,

Plaintiff contends that Deputy Chief Johnson and Kehrle "acted aggressively toward Plaintiff"

during the driveway incident on November 13, 2004.  (Doc. No. 90 at 19.)  Specifically, Plaintiff

contends that "Kehrle pounded on Plaintiff's car door and threatened to break the window if she

did not exit the vehicle, while [Deputy Chief] Johnson, after blocking her escape by parking his

vehicle behind hers, stood nearby waving his arms and screaming obscene threats at her."  (*Id.*)

Plaintiff further contends that during the December 22, 2004 arrest at Plaintiff's place of

employment, Detective Johnson "violently slammed the [telephone] receiver back onto the hook,

with [Plaintiff's] hand still holding the instrument," which was "totally unnecessary."  (*Id.*)

Detective Johnson and Kehrle respond that "words, themselves, are insufficient" to state a claim

for assault or battery.  (Doc. No. 77-2 at 26.)  Detective Johnson and Kehrle further respond that

"police officers are entitled, under Pennsylvania law, to use reasonable and necessary force to

effectuate a lawful arrest."  (*Id.* at 27.)  Finally, Deputy Chief Johnson argues that he committed

no "acts" upon which to ground a claim of assault or battery.  (*See* Doc. No. 78-2 at 13.)

Under Pennsylvania law, "[a]n assault occurs when an actor intends to cause an imminent

apprehension of a harmful or offensive bodily contact."  *Sides v. Cleland*, 648 A.2d 793, 796

(Pa. Super. Ct. 1994), *appeal denied*, 656 A.2d 11 (Pa. 1995) (*citing* Restatement (Second) of

Torts § 21).  "Words in themselves, no matter how threatening, do not constitute an assault; the

actor must be in a position to carry out the threat immediately, and he must take some

affirmative action to do so."  *Cucinotti v. Ortmann*, 159 A.2d 216, 217 (Pa. 1960); *see also*

*McDonald v. Darby Borough*, No. 07-4588, 2008 WL 4461912, at *6 (E.D. Pa. Oct. 3, 2008)

(citing *Cucinotti* and holding same).  "A battery is defined as a 'harmful or offensive contact'

with the person of another."  *C.C.H. v. Phila. Phillies, Inc.*, 940 A.2d 336, 340 n.4 (Pa. 2008)

(*citing Dalrymple v. Brown*, 701 A.2d 164, 170 (Pa. 1997)).  A police officer does not commit an

assault or battery when acting in furtherance of his or her statutory duty of using "any force

which [the officer] believes to be necessary to effect the arrest."  18 Pa. Cons. Stat. Ann. § 508

(2008).  Rather, a police officer can be liable for assault or battery only if the officer uses

excessive force to effect the arrest.  *See Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa.

1994).  In *Renk*, the Pennsylvania Supreme Court explained the potential for liability as follows:

> A police officer may use reasonable force to prevent interference with the exercise
> of his authority or the performance of his duty.  In making a lawful arrest, a police
> officer may use such force as is reasonably necessary under the circumstances to
> effectuate the arrest.  The reasonableness of force used in making the arrest
> determines whether the police officer's conduct constitutes an assault and battery.

*Renk*, 641 A.2d at 293.

Detective Johnson and Sergeant Kehrle did not use excessive force that would subject

them to civil liability for assault and battery.  As discussed above, Detective Johnson and

Sergeant Kehrle made lawful arrests that were based on probable cause.  Plaintiff may believe

that Detective Johnson and Sergeant Kehrle acted unprofessionally by threatening to break the

car window in order to arrest her after she locked herself inside the car, or by "slamm[ing] the

[telephone] receiver back on the hook" while arresting her at her place of employment.

However, these actions do not constitute the use of excessive force.  Indeed, Plaintiff does not

argue excessive force in her responses.  The threat to break into Plaintiff's vehicle was not

unreasonable given Plaintiff's refusal to exit the vehicle, refusal to leave the Kuhfuss premises,

and Sergeant Kehrle's concerns for Plaintiff's own safety.  Moreover, Detective Johnson's display of force in hanging up Plaintiff's telephone was not unreasonable under the circumstances.  Plaintiff suffered no injury in either instance.  The force used was no more than was necessary to effect an arrest.

Finally, the conduct of Deputy Chief Johnson in "waving his arms and screaming obscene threats" did not constitute an assault against Plaintiff.  Plaintiff testified that Deputy Chief Johnson screamed a number of obscenities at her but "the only thing [that Plaintiff] could comprehend was, 'I hope you go to hell, you fucking bitch.'" (Pl.'s Dep. 233.)  "Words in themselves, no matter how threatening, do not constitute an assault."  *See Cucinotti*, 159 A.2d at 217.  Deputy Chief Johnson's shouting of this obscenity at Plaintiff, without more, does not constitute an assault.  Moreover, his shouting does not constitute a battery since Plaintiff testified that Deputy Chief Johnson did not attempt to make physical contact with her and did not, in fact, make any physical contact.  (Pl.'s Dep. 234.)  There is also no evidence that Kehlre had physical contact with Plaintiff except to grab her keys when she exited her car.  Plaintiff's battery claims therefore fail since there was no "harmful or offensive contact."  *See C.C.H.*, 940 A.2d at 340 n.4.

Because Defendants' liability for assault and battery is foreclosed by 18 Pa. Cons. Stat. Ann. § 508, and because the conduct of which Plaintiff complains does not constitute an assault or battery, summary judgment must be entered in favor of Defendants.

### C.   Count III:  False Imprisonment and False Arrest

"The Pennsylvania torts of false arrest and false imprisonment are essentially the same actions."  *McDonald*, 2008 WL 4461912, at *7.  "The elements of false imprisonment are (1) the

detention of another person, and (2) the unlawfulness of such detention." *McDonald*, 2008 WL 4461912, at *7 (*citing Renk*, 641 A.2d at 293); *Zumbado v. City of Allentown*, No. 07-2459, 2009 WL 310236, at *10 (E.D. Pa. Feb. 6, 2009) (noting same). In order for such actions to succeed, a plaintiff must demonstrate that she was arrested without probable cause, for example, through the use of a facially invalid arrest warrant. *See Olender v. Twp. of Bensalem*, 32 F. Supp. 2d 775, 791 (E.D. Pa. 1999), *aff'd*, 202 F.3d 254 (3d Cir. 1999) ("For an action for false arrest against a police officer to succeed, it must appear that the arrest warrant was facially invalid."); *Lynch v. Johnston*, 463 A.2d 87, 89 (Pa. Commw. Ct. 1983) ("For an action of false arrest to succeed, it must appear that the process used for the arrest was void on its face or that the issuing tribunal was without jurisdiction; it is not enough that the charges were unjustified."); *Gagliardi v. Lynn*, 285 A.2d 109, 110 (Pa. 1971) ("Detainment and confinement constitute the gravamen of the civil wrong committed by an individual who illegally asserts or employs authority over another while purportedly enforcing the law. This civil wrong can be denominated as either false arrest or false imprisonment.").

For the reasons set forth above, Plaintiff's arrests were supported by probable cause. There was no false arrest and there was no false imprisonment. *See Startzell v. City of Phila.*, 533 F.3d 183, 204 (3d Cir. 2008) (affirming grant of summary judgment where "[the plaintiff] failed to show lack of probable cause, a necessary element of a false arrest and malicious prosecution claim"). Summary judgment in favor of Defendants on Plaintiff's false arrest and false imprisonment claims is appropriate.

## V.  CONCLUSION

For these reasons, the Motions for Summary Judgment of Detective Johnson, Sergeant

Kehrle, and Deputy Chief Johnson will be granted.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LYNNE A. REGAN                         :
                                       :                    CIVIL ACTION
                    v.                 :
                                       :                    NO. 06-1686
UPPER DARBY TOWNSHIP, ET AL.           :

## **ORDER**

AND NOW, this ___11th___ day of March, 2009, upon consideration of the Motions for

Summary Judgment of Defendants Thomas A. Johnson and Michael Kehrle (Doc. No. 77) and

Defendant James Johnson (Doc. No. 78), and all documents submitted in support thereof and in

opposition thereto, it is ORDERED that the Motions are GRANTED.

IT IS SO ORDERED.


BY THE COURT:


_____
R. Barclay Surrick, J.